81 N.J. Super. 536 (1963)
196 A.2d 256
WADSWORTH CRESSE, JR., APPELLANT,
v.
NED J. PARSEKIAN, DIRECTOR OF THE DIVISION OF MOTOR VEHICLES IN THE DEPARTMENT OF LAW AND PUBLIC SAFETY OF THE STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 23, 1963.
Decided December 20, 1963.
*539 Before Judges GAULKIN, LEWIS and LABRECQUE.
Mr. Sam Denstman argued the cause for the appellant (Messrs. Simon, Jaffe & Denstman, attorneys).
Mr. Paul G. Levy, Deputy Attorney General, argued the cause for the respondent (Mr. Arthur J. Sills, Attorney General, attorney).
The opinion of the court was delivered by GAULKIN, S.J.A.D.
After our previous decision in this case, reported in 75 N.J. Super. 405 (App. Div. 1962), the Director notified Cresse that he proposed to revoke Cresse's license because he had entered Tanyard Road from Salina Road, a stop street, without yielding the right of way to traffic on Tanyard Road "which is so close as to constitute an immediate hazard," in violation of N.J.S.A. 39:4-144, as a result of which there was an accident in which Salvatore Villari, a passenger in a car driven by Charles P. Bailey, was killed. Following a hearing, the hearer found "the charge has been substantiated," and recommended a one-year suspension of Cresse's driving privileges. The Director came to the same conclusion, in an opinion in which he departed somewhat from the hearer's findings, and Cresse appeals.
Cresse contends that the order "should be reversed because it is not supported by substantial evidence." He argues:
"A reading of the Director's Memorandum Decision, we urge, should indicate to the Court that the Director did not consider the *540 record as a whole in arriving at his conclusions. This reading indicates, we think, that the Director sifted the record and screened from it all evidence  of which there was much  which tended to exonerate Cresse and that the Director retained and relied upon a trace of testimony here and a suggestion there, all lifted out of context, and amounting in toto to less than scintilla. It seems that the Director was determined to arrive at a finding of guilt and gave the record a strained interpretation in order to do so. The record if considered in its entirety, called for a different result. * * *."
It will not be necessary to deal with every point made by Cresse in his careful dissection of the Director's opinion. It will suffice for the purposes of this opinion to summarize the main points of the Director's findings and our views thereon.

I.
The Director found that Bailey was traveling "at approximately 50 M.P.H. or slightly in excess thereof," and not 60 to 70 miles per hour, as Cresse contends and his expert testified.
We are satisfied, however, upon the whole record, that it cannot reasonably be concluded that Bailey was traveling only "50 M.P.H. or slightly in excess thereof" when he entered the intersection. We find that he was traveling at least 60 miles per hour at that time.
The Uniform Table of Driver Stopping Distances, agreed upon by ten national safety organizations (Am. Jur.2d Desk Book, p. 456) shows that the average driver will bring a passenger car with good brakes to a stop within the following distances after the driver sees danger: at 50 m.p.h., 258 feet; 60 m.p.h., 360 feet; 70 m.p.h., 486 feet. At 50 m.p.h., a car travels about 73 feet per second; at 60 m.p.h., about 88 feet per second; at 70 m.p.h., about 103 feet per second.
Tanyard Road slopes downward toward the intersection in question from the crest of a knoll about 1,500 feet north of the intersection. After Bailey came over the crest of the knoll, traveling south, he had an unobstructed view for the full 1,500 feet, for Tanyard Road is a straightaway. Bailey testified he first saw Cresse's car when it was about 80 feet east of *541 the intersection (which would be before Cresse stopped for the stop sign) and that he slowed down to 35 to 40 m.p.h. before he entered the intersection and collided with Cresse's car. Yet, after the collision, the Villari car (a 1954 Buick sedan) traveled southwesterly across the intersection about 30 feet, mounted and "chewed up" the earth bank, struck a utility pole on the southwest corner, changed course, traveled backward (probably tipped towards its left side) an additional 75 feet southerly along the edge of the dirt embankment which bordered Tanyard Road on the west, and then struck a second utility pole with such force that it not only sheared off the pole, but the Buick was cut almost in half by the pole, from the solid metal roof down to the chassis. The photographs demonstrate that, when it struck the second pole, the Buick must have been sliding on its left side.
Cresse points out many items in Bailey's testimony which prove him to be a witness not to be believed. We shall not itemize them. Suffice it to say that we agree that Bailey was not a credible witness. We are aware that we did not see him or hear his testimony, but neither did the Director, and the Director himself (as did the hearer) rejected important parts of Bailey's testimony.
In short, upon all of the testimony and the photographs, we hold that it can not be doubted that Bailey was traveling at least 60 miles an hour.

II.
The Director found that even from where Cresse said he stopped his car, in obedience to the stop sign, he had a view northward on Tanyard Road of 1,050 feet and, if he did not see Bailey approaching, it was because he did not look. We find that the record does not justify this finding.
Cresse testified that, when he stopped because of the stop sign, the front of his car was about one foot east of the tip of the grass island on the northerly side of Salina Road. This, he said, was 12 to 12 1/2 feet from the easterly edge of *542 the Tanyard Road pavement. From this point, he said, he could see about 300 feet north on Tanyard Road. Trooper Fognano testified that he stopped his car "within five feet" of the "berm" on the easterly side of Tanyard Road and from there he could see northerly about two-tenths of a mile (1,056 feet). The Director found that the two men stopped at approximately the same location; that therefore the explanation of the "discrepancy of 750 feet of visibility * * * depends upon the credibility of the witnesses"; and that Fognano, and not Cresse, was to be believed.
However, the record does not support the finding that the two men stopped at the same point. Fognano testified he stopped "within five feet" of the "berm." He described what he meant by "berm," as follows: "* * * we consider those roads as having no shoulders: From the paved portion there is just a slight area of dirt prior to coming to the grass berm. There is no room for a car to pull off the side there." Officer Kivlen testified that the paved portion of the road "runs directly to the grass," and the photographs bear him out. The hearer, in his findings, interpreted Fognano's testimony as being that he stopped "5 feet from the paved surface of the roadway."
We do not know what Fognano meant when he said he stopped "within five feet" of the berm  whether he meant 1, 2, 3, 4 or 5 feet. If Fognano stopped exactly 5 feet from the "berm," the berm had to be 7 feet from the Tanyard Road pavement to put Fognano at the same point at which Cresse testified he stopped. If Fognano stopped closer to the berm than 5 feet, the distance from the "berm" to the pavement had to be correspondingly greater than 7 feet to make up the 12 or 12 1/2 feet. It is plain from the testimony and the photographs that the space between the Tanyard Road pavement and the "berm," as defined by Fognano, was a matter of inches  certainly not 7 or more feet. Hence the two men did not look northward from the same point, and there is no basis for the finding that Cresse, had he looked from where he stopped, could have seen a distance of 1,056 feet.

*543 III.
The Director held that, if Cresse could indeed see only 300 feet or so northward on Tanyard Road from where he stopped, this obliged him to keep looking  i.e., to make "effective observation"  as he moved forward into Tanyard Road, for the speed limit on that road was 50 m.p.h. or 73 feet per second; that failure to make such observation violated N.J.S.A. 39:4-144; and that, if he had made such observation, he would have seen Bailey, at whatever speed Bailey was traveling, and could have avoided the accident.
Cresse testified that, after he stopped, he looked north and then south and then he moved forward into the intersection without looking again to left or right. According to his own testimony, he moved about 25 feet before he was struck (12 to 12 1/2 feet to the edge of the pavement plus another 12 to 12 1/2 feet to bring him into the northwesterly quadrant of the intersection, where he was hit), and that at the time he was struck he was traveling about 5 m.p.h. or about 7 1/2 feet per second. Since he started from a stopped position, it must have taken him almost four seconds to reach the point of impact. He himself estimated the time as four seconds. In four seconds a car traveling 50 m.p.h. travels approximately 292 feet; at 55 m.p.h., 324 feet; at 60 m.p.h., 352 feet.
Cresse contends that, once a motorist makes a proper stop in obedience to a stop sign, and a maximum observation from that point reveals no oncoming traffic, he is not obliged, by N.J.S.A. 39:4-144, to make further observation as he crosses the intersecting street. He argues that, if the terrain, obstructions or other circumstances do indicate the need to make further observation, the failure to do so may violate the careless driving section (N.J.S.A. 39:4-97) or other sections of the Motor Vehicle Act, but such failure does not violate 39:4-144, which is the only charge here; and, in any event, there were no facts or circumstances here which required him to make further observation. He argues that he had a right to assume traffic on Tanyard Road would obey *544 the speed limit; he was not obliged to look out for speeders; and if Bailey had been traveling at not over 50 m.p.h., from a point beyond 300 feet, he could have stopped altogether without hitting him, or, at least, slowed down sufficiently to permit him to go through the intersection.
We agree with Cresse that Bailey was negligent and that his negligence was the chief cause of the accident. Indeed, if this were an action for damages, a jury might well find that Cresse was not negligent, or if he was, that his negligence did not contribute proximately to cause the accident. Nevertheless, we agree with the Director that, under the circumstances that existed here, it was Cresse's obligation to make further observation as he moved into the intersection, and that his failure to do so violated 39:4-144. This made his license subject to suspension by the Director, under N.J.S.A. 39:5-30. Such a violation need not cause an accident, to subject the violator to a suspension.
N.J.S.A. 39:4-144 in part provides:
"No driver of a vehicle or street car shall enter upon or cross an intersecting street marked with a `stop' sign unless he has first brought his vehicle * * * to a complete stop at a point within 5 feet of the nearest crosswalk or stop line marked upon the pavement at the near side of the intersecting street and shall proceed only after yielding the right of way to all traffic on the intersecting street which is so close as to constitute an immediate hazard. * * *"
Cresse argues: "The statute does not in express language provide that the motorist shall make an observation for traffic approaching on the intersecting street. If, by implication it requires him to make such an observation, it is clear that it requires this observation to be made from the stop position at the place designated in the statute. This is so, because the statute permits the motorist to `proceed' after stopping, only after yielding the right of way to oncoming traffic close enough to constitute an immediate hazard. The statute does not require the motorist to move forward, stop again and make another observation before proceeding further."
*545 Cresse's argument would mean that, if the motorist stopped as required by 39:4-144 and saw no cars coming, he could move into the intersecting street without looking again, no matter how limited his view might have been from the point at which he stopped, without violating said section. This appears to us to be too narrow a construction of the section. The section does not say that the motorist shall proceed after making observation, but that he "shall proceed only after yielding the right of way to all traffic on the intersecting street which is so close as to constitute an immediate hazard." It seems to us that the intent of the section is to bring the motorist to a full stop for the very purpose of compelling him to look carefully for oncoming traffic as he enters and crosses the intersecting street. 2 Blashfield's Cyclopedia of Automobile Law and Practice, § 1032, p. 115 (1963 pocket parts); Capital Transit Company v. Hedin, 222 F.2d 41, 95 U.S. App. D.C. 351 (1955); MacDougall v. Chalmers, 192 Pa. Super. 401, 162 A.2d 51 (Super. Ct. 1960).
There is nothing in the statute which justifies the interpretation advanced by Cresse that the motorist does enough when he looks as far as he can see from the point at which he stops in compliance with a stop sign. Such a construction would presuppose that each point at which a motorist must stop in obedience to a stop sign is fixed by engineers as one from which it has been calculated that sufficient observation for safety can be made. That is obviously not so.
To begin with, "a stop intersection" may be established by the local authorities (subject to the approval of the Director) as well as by the State Highway Commissioner. N.J.S.A. 39:4-140. Furthermore, not all crosswalks are "marked upon the pavement." A crosswalk is often bounded by invisible, imaginary lines, as it was in the case at bar. N.J.S.A. 39:1-1. Finally, the motorist may stop wherever he pleases "within 5 feet" of the crosswalk or stop line. Obviously, the closer one is to the intersecting roadway, the more he usually can see of oncoming traffic. Common experience tells us that there may be permanent as well as temporary *546 obstructions to one's view at stop street intersection: for example, buildings, billboards, shrubbery, parked cars, crowded sidewalks, etc.
For the foregoing reasons, we hold that section 39:4-144 requires the motorist, before and as he moves from his stopped position, to make such observation for oncoming traffic as the circumstances at the particular intersection reasonably require.
Tested by this standard, Cresse did violate 39:4-144. By his own testimony, he moved about 25 feet from his standing position into the northwest quadrant of the intersection without looking again to the north, in spite of the fact that he was moving so slowly that when he was hit he had accelerated to only 5 m.p.h. or 7 1/2 feet per second. Even had he been moving at that speed from the moment he started from his stopped position, in 4 seconds he would have been in the southbound lane, directly in the path of cars coming from his right. The road was very narrow  each lane was about 12 feet wide  and encroachment into the southbound lane gave little if any room to pass; and every second cut that space by 7 1/2 feet. Even if Cresse had the right to assume, as he argues, that traffic on Tanyard Road would not exceed 50 m.p.h. or 73 feet per second, a car traveling at that speed, from a point just beyond the 300-foot range of his vision from the stopped position, would inevitably have been upon him while he was in the southbound lane. We hold, therefore, that Cresse was under a duty to make a further observation to his right as he entered the intersection. If he had done so, he would have seen Bailey, even if the latter had been traveling at 60 to 70 m.p.h.

IV.
This brings us to the question of the penalty. Cresse contends that any suspension of driving privileges is "punitive in nature"; that punishment is a judicial function; that the Director is a member of the executive branch of the *547 government and his "meting out of punishment for the violation of the provisions of Title 39 of the Revised Statutes, clearly a judicial function, would violate Article VI, Sec. 1 of the Constitution of 1947 which confides the judicial power to the courts alone." See State v. Osborn, 32 N.J. 117 (1960). He argues:
"In the past, revocations and suspensions imposed by the Director have been sustained as being `not necessarily' punitive but rather as in the nature of `administrative sanctions' aimed at removing unsafe drivers from the road. See Vance v. State [Division of Motor Vehicles], 67 N.J. Super. 63 (App. Div. 1961); Atkinson v. Parsekian, [37 N.J. 143 (1962)]; Sylcox v. Dearden, [30 N.J. Super. 325, 329 (App. Div. 1954)]. The resort to such language in order to sustain the Director's action seems to amount to an exercise in semantics in view of other judicial expressions recognizing the value of a driver's license and the seriousness of its loss. Vide: `* * * in today's society a license to operate an automobile may be of vital significance and value to the licensee,' Bechler v. Parsekian, 36 N.J. 242, 257 (1961), and `[t]he fact remains that today the very livelihood of a man and his family may depend upon his license.' Parsekian v. Cresse, 75 N.J. Super. 405, 411 (App. Div. 1962). The Court need only look about to be informed that we live in a motorized economy that moves on rubber tires, and that the impact of a license suspension is punishment, whatever the terminology one employs to justify such punishment when given by a member of the executive branch of government."
Cresse argues further that, assuming the suspension of driving privileges is not always punishment, the suspension here was so excessive as to constitute punishment, and should therefore be set aside as ultra vires. Finally, he argues that, if not ultra vires, the suspension should be very sharply reduced, in view of his previous good driving record and his need for a driver's license.
The maximum fine that can be imposed by a judge for violating 39:4-144 is $50, and the maximum prison term is 15 days. N.J.S.A. 39:4-203. We agree that most people would pay even a $50 fine, and many would go to jail for 15 days, rather than lose their driving privileges for a year. We agree also that the layman very likely cannot understand how a suspension of his license can be called anything other than *548 punishment when the smallest fine is called punishment. Nevertheless, it appears to be settled that the Director does have the power to suspend or revoke licenses, and that the reasonable exercise of that power by him is not punitive and does not violate the Constitution. Atkinson v. Parsekian, 37 N.J. 143 (1962); Bechler v. Parsekian, 36 N.J. 242 (1961); Vance v. State Division of Motor Vehicles, 67 N.J. Super. 63 (App. Div. 1961); Sylcox v. Dearden, 30 N.J. Super. 325, 329 (App. Div. 1954).

V.
Cresse's attack upon the reasonableness of the suspension brings up the question whether there are any limits to the Director's discretion, and, if so, what they are. The Director does not deny that the courts do have the right to review a suspension and its length. See Atkinson v. Parsekian, supra, 37 N.J., at p. 157; Vance v. State, supra, 67 N.J. Super., at p. 68. Cf. In re Larson, 17 N.J. Super. 564 (App. Div. 1952).
We assume that we may not interfere with the Director's exercise of his discretion unless it has been "abused," (Borough of Fanwood v. Rocco, 59 N.J. Super. 306, 317-319 (App. Div. 1960), affirmed 33 N.J. 404 (1960)), but how do we determine whether it has been "abused"?
The statute contains no limitation on the length of the suspension which the Director may impose, and no fixed standards to control the exercise of this power. In addition, the Legislature has given him powers greater, in some respects, than those of a judge. He may suspend or revoke a driver's license for a violation of any provision of the motor vehicle act "or on any other reasonable grounds," (but see Wolan v. Ferber, 12 N.J. Super. 167, 171 (App. Div. 1951)) whereas a judge may only revoke, and then only for a "willful violation." N.J.S.A. 39:5-30, 31. And the Legislature has given these greater powers to the Director in spite of the fact that before a judge the evidence must *549 prove a defendant guilty beyond a reasonable doubt, whereas the Director may act upon a mere preponderance of the evidence.
It is not for us to question the wisdom of the legislative scheme. However, from the very fact that the Legislature gave the Director such broad powers, we deduce that the powers were given him not to authorize him to punish a motorist for what he did in the past, but to enable him to make sure that, whenever necessary, the motorist be kept off the highway until he can be expected to operate a motor vehicle with safety to himself and to others. We conceive that it is the Director's function to impose suspensions for the purpose of reforming the particular motorist, and not for the purpose of frightening and deterring others, even though that may be an incidental result. To impose sanctions beyond what is needed to reform the individual, in order to frighten others, is a function of punishment, beyond the power of the Director.
The Director must weigh each case individually, to determine whether a suspension is required at all for the purposes above mentioned, and, if so, for how long. Among other things, he should consider the facts which constitute the particular violation; whether the motorist was willful or reckless, or merely negligent, and, if merely negligent, how negligent; how long the motorist has been driving; whether this is his first offense; whether he has been involved in any accidents; his age and physical condition; whether there were any aggravating circumstances, such as drinking, or, on the other hand, whether there were extenuating circumstances. Upon these and all the other facts and circumstances, he should determine whether it reasonably appears, as a matter of prophylaxis and not of punishment, that the motorist should be kept off the highway, and, if so, for how long.
Since each case must be considered individually, it seems to us it would be improper for the Director to fix mandatory minimum suspensions for those violations which *550 contribute to the causation of fatal accidents. Cresse charges that the Director suspended his license for one year in total disregard of his excellent prior record and the facts and circumstances of his case, and only because he had established a policy of a minimum suspension of one year in all fatal accident cases. The Director denies this.
Following oral argument, the Director submitted to us the data which he submitted to the Supreme Court in Atkinson v. Parsekian, supra. Therein he said that, on March 21, 1961, he appointed a Fatal Accident Board within his department, consisting of the Chief of the Driver Improvement Section and two inspectors, and that:
"* * * It is the function of the Board to study the State Police reports, reports of local police, diagrams of the scene of the accident, sworn statements (if any), and any other available evidence of the circumstances surrounding the accident, to determine whether a notice of proposed suspension should be issued to the motorist.
In response to your request, the Division has made an analysis of every fatal accident case reviewed by the Fatal Accident Board from March 21, 1961, to February 23, 1962. A total of 452 fatal accidents were considered by the Board, involving 614 drivers, which resulted in the death of 502 persons.
The Board recommended the following:

 A proposed notice of suspension issued to motorist ........ 129 cases
 No grounds for action by the Division ..................... 172 cases
 One car accident, driver killed; therefore, no action ..... 110 cases
 Driver who was responsible for the fatality killed;
 therefore, no action .................................... 30 cases
 Family relationship between driver probably responsible
 and deceased. No action recommended ..................... 11 cases
 TOTAL ............................................... 452 cases

The 129 cases referred to above involved 208 drivers. The Division made the following determinations as to these drivers:

 Drivers held responsible and revocation entered ......... 126 drivers
 Drivers considered blameless and no action taken ........ 82 drivers
 TOTAL ............................................. 208 drivers"

However, he does report that, out of 126 cases, only one suspension was for less than one year. The other 125 were *551 for one to 10 years. These figures seem to indicate that, in practice, there has been a one-year minimum suspension period in fatal accident cases. No figures have been given for the period since February 23, 1962.
These figures also seem to indicate that an element of punishment may be entering into the Director's decisions. For example, whenever there was a family relationship between the "driver probably responsible" and the person killed, no action against the driver has been taken, no matter how culpable the driver may have been, or how much in need of "driver improvement"; apparently on the theory that the driver had been punished enough. Certainly, such a distinction cannot be made on the theory that a driver whose relative has been killed has learned his lesson, whereas the driver who killed a nonrelative has not.
Any negligence or violation, however slight, may, given the appropriate setting, contribute to a fatal accident. For example, illegal parking may contribute to a fatal accident. To impose a suspension without regard to the nature and the degree of the negligence or violation, and to the surrounding circumstances, for the primary purpose of deterring others, is punishment and not prophylaxis.
As we have said, we are convinced that, in the case at bar, the accident was caused primarily by Bailey's speeding and negligence. Had he not been speeding, and had he made a proper observation, he could have seen the front of Cresse's car entering the intersection in time to stop, or to sound his horn, which probably would have avoided the accident.
Cresse was on his way to a doctor for a routine eye checkup for one of his two sons, 13 and 8, who were with him in his car. He was in no hurry. Bailey, on the other hand, was hunting for a part to fix a tractor belonging to Villari. He had already been to one place in search of the part when the accident happened. It was a Saturday. Ordinarily Bailey, 23 years old, worked only until noon on Saturday, but on this Saturday he would have had to work until he found the part and fixed the tractor.
*552 Cresse, a lawyer admitted to the bar since 1940, testified that he has been a licensed driver for 35 years, and that during that period he received only one "ticket" for a traffic violation, in 1941. He stated that his office was in Woodbury, N.J., eight or nine miles from his home; that his was a "country practice" in which he had "to go around and visit township committee meetings in the evening, municipal courts, all of which hold their sessions in the evening, in the outlying townships in the county"; that his family consisted of three small children and himself, none of driving age, and that the deprivation of his license would "very seriously" curtail his ability to earn a living.
However, the record does not indicate whether Mr. Cresse had any previous accidents. On the other hand, neither the record nor the findings of the Director indicate how or why he arrived at the one-year suspension. We can not be sure whether the Director used the criteria which we have suggested he use, or what, if any, different criteria he did use. It does seem that his approach may have been tinged with an element of punishment, and, finally, that the suspension may have been fixed at a year because of a preconceived policy.
Under all of the circumstances, we think it best that the matter be remanded to the Director for a hearing confined to the issue of suspension and its duration. A record should be made of the underlying facts and circumstances, other than those already in the record, upon which the extent of the suspension, if any, will be predicated. The Director should state the reasons for the conclusion he will then reach. The determination by the Director must, of course, be based upon the facts as we have found them to be in this opinion. We do not retain jurisdiction. No costs.